**In re Mark Allen GRAY and Tracie Nicole Gray, Debtors.**

**Case No. 401–47400–DML–13.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Nov. 14, 2002.

James M. Morrison, Ft. Worth, TX, for plaintiff.

Alan Bartlett Padfield, Lively & Padfield, Ft. Worth, TX, for defendant.

### MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the objection of American Investment Bank, N.A., f/k/a Tranex Credit Corporation, ("AIB") to confirmation of the final chapter 13 plan (the "Plan") filed by Mark Allen Gray and Tracie Nicole Gray ("Debtors"). The instant controversy involves the treatment of AIB's claim secured by a 1996 Mazda B2300 truck (the "Truck"). On August 22, 2002 (the "Hearing"), the court received evidence and heard oral arguments from Debtors and AIB in support of their respective positions. At the court's invitation, Debtors filed a supplemental brief (the "Supplemental Brief") on September 12, 2002. On September 27, 2002, AIB filed its reply brief (the "Reply Brief"). This memorandum constitutes the court's findings of fact and conclusions of law.[1] This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

### I. Background

On or about March 2, 1999, Debtors entered into a retail installment contract (the "Contract") for the purchase of the Truck. AIB provided funds for this transaction and holds a first lien against the Truck perfected by notation on the Truck's

---

1. *See* Fed. R. Bankr.P. 7052 and 9014.

certificate of title.[2] Pursuant to the Contract, Debtors financed $11,963.03 at an annual percentage rate of 21.00%, payable in sixty equal monthly installments of $323.69.[3]

Debtors filed their joint chapter 13 petition for relief under section 302(a) on October 10, 2001. On November 13, 2001, AIB filed a proof of claim asserting that the value of the Truck was $8,450.00, and that AIB held a secured claim against Debtors in the amount of $8,200.33. On June 4, 2002, Debtors filed the Plan. In the Plan, Debtors valued the Truck (and, correspondingly, AIB's secured claim) at $4,640.00, and proposed to pay this amount to AIB in twenty-four monthly installments of $189.00 each (which equated to an annual percentage rate of 13.00%). Because the Plan provided no dividend to unsecured creditors, AIB stood to receive nothing on the unsecured portion of its claim against Debtors. The Plan also required AIB to release its lien against the Truck upon full payment of AIB's secured claim. Disagreeing with the proposed treatment of its claim by the Plan, AIB now objects to the Plan's confirmation on the following bases:

a) The Truck (and, thereby, AIB's secured claim) should be valued at $6,850.00 instead of $4,640.00;

b) The interest rate on AIB's secured claim should be 21.00% instead of 13.00%; and

c) AIB should not be forced to release its lien against the Truck until Debt-

ors have completed the Plan and received a discharge.

## II. Issues

The parties have presented the following issues which the court must decide:

a) How should the value of the Truck be calculated?

b) What interest rate is AIB entitled to on its secured claim in order for it to receive treatment as required by section 1325(a)(5)(B)?

c) May the Plan be confirmed containing a provision which requires AIB to release its lien upon full payment by Debtors of the amount AIB is entitled to under section 1325(a)(5)(B)?

## III. Discussion

### A. The Value of the Truck

In order to confirm the Plan, this court must find that the provisions of the Plan meet the requirements of section 1325(a) of the Bankruptcy Code. In particular, the treatment of a secured creditor such as AIB is dictated by section 1325(a)(5). Under that subsection, a plan's proposed treatment of a secured claim can be confirmed only if one of three conditions is satisfied:

1) The secured creditor accepts the plan; [4]

2) The debtor surrenders to the secured creditor the property securing the claim; [5] or

3) The debtor invokes "cram-down".[6]

---

**2.** With exceptions not relevant here, a lien on a motor vehicle is perfected by retention by the lienholder of the certificate of title to the vehicle and reflection of the lien on the title. *See* TEX. TRANSP. CODE ANN. § 501.111, et seq. (Vernon 2001).

**3.** In total, Debtors agreed to pay $19,421.40 under the Contract.

**4.** 11 U.S.C. § 1325(a)(5)(A).

**5.** 11 U.S.C. § 1325(a)(5)(C).

**6.** 11 U.S.C. § 1325(a)(5)(B).

Here, having neither obtained AIB's acceptance nor surrendered the Truck, Debtors must rely on the "cram-down" provisions of section 1325(a)(5)(B).

■ Under the cram-down option, a debtor is permitted to keep property over the objection of a secured creditor if the creditor retains its lien securing the claim and the debtor provides the creditor with payments, over a time not to exceed the life of the debtor's chapter 13 plan, that will total the present value of the allowed secured claim (*i.e.*, the present value of the collateral).[7] As described in *Rash*[8] the amount of a creditor's allowed secured claim will be determined pursuant to section 506(a), which states in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.[9]

■ The Supreme Court held in *Rash* that the value of property retained because a debtor has exercised the section 1325(a)(5)(B) cram-down option is to be determined based on the cost the debtor would incur to obtain a like asset for the same proposed use.[10] Determination of this "replacement value" requires the court to consider the price a willing buyer in the debtor's situation would pay a willing seller to obtain property of like age and condition.[11] In *Rash*, the Supreme Court specifically left to the bankruptcy court, as trier of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented.[12]

In this case, Debtors have proffered the Kelly Blue Book private party value (the "KBB Value"), $4,640.00, as the proper measure of the value of the Truck. AIB, on the other hand, contends that the court must adopt the retail value established by the National Automobile Dealers Association (the "NADA Value"), $6,850.00.[13] Neither party has provided the court with conclusive evidence that either standard is correct under *Rash.*[14]

---

7. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 956, 117 S.Ct. 1879, 1880–81, 138 L.Ed.2d 148 (1997).

8. *Id.* at 960, 117 S.Ct. 1879.

9. 11 U.S.C. § 506(a).

10. *Rash*, 520 U.S. at 965, 117 S.Ct. 1879.

11. *Id.* at 959 n. 2, 117 S.Ct. 1879.

12. *Id.* at 965 n. 6, 117 S.Ct. 1879.

13. In support of its position, AIB offers the proposition that Debtors, because of their compromised credit condition, would be forced to obtain subprime financing to purchase a replacement vehicle. AIB further contends that a dealership is the only place Debtors would find a "willing seller" providing such financing, and that, therefore, the price a dealer would demand for the Truck is the appropriate measure of replacement value. While, as discussed in Section III.B below, the court concedes Debtors have not carried the burden of rebutting the presumption in favor of the subprime rate in the Contract, it may seem inequitable to give AIB two trips to the trough by allowing it to pump up the value of its secured claim merely because a dealership would be the only party with the temerity to offer auto financing at 21.00%. On the other hand, the court concludes that, absent evidence to the contrary, for purposes of valuation under *Rash* and section 1325(a)(5)(B), it is appropriate to assume Debtors would buy their vehicle in the established retail market from a dealer.

14. At the Hearing, Debtors provided testimony that the instant KBB Value was as of December 7, 2001, taking account of the

■ In the absence of controverting facts, the court concludes that the NADA Value is more representative of the price likely to be charged for the Truck by a dealership. The NADA Value, however, would include allowances for commissions payable to salespeople, limited mechanical and cosmetic refurbishment of the vehicle prior to sale, a limited warranty on the vehicle (if appropriate), overhead costs for storage and insurance for the vehicle, and some carrying charge for the period between the dealer's purchase of the vehicle and the sale to a customer. The Supreme Court has opined that such items are not properly included in determining replacement value for cram-down purposes.[15]

The KBB Value, on the other hand, represents the price at which a party could obtain a replacement vehicle from a non-dealership seller. While Debtors might not be able to acquire a vehicle at the KBB Value, a dealership certainly could.

■ Assuming that a dealer could buy a vehicle identical to the Truck at the KBB Value, and that Debtors would purchase the same vehicle from a dealer at the NADA Value, and given the need to dis-count the latter to allow for add-ons, the court concludes that, for purposes of section 1325(a)(5)(B), the value of the Truck lies somewhere between the KBB Value and the NADA Value. The NADA Value provides a good starting point in the court's calculation of the Truck's replacement cost, but the parties have presented no evidence of the amount by which *Rash* requires its reduction.[16] The court, therefore, must arrive at the fairest approximation of value it can fashion. The midpoint between the NADA Value and the KBB Value is an appropriate estimate of Debtors' replacement cost.[17] The court, therefore, concludes the value of the Truck (and AIB's secured claim) to be $5,745.00.[18]

## B. The Proper Interest Rate is the Contract Rate

AIB objects to the Plan's proposed payment of interest at the rate of 13.00%. AIB contends that Debtors should be required to pay interest at the rate of 21.00% on AIB's secured claim-the rate provided for in the Contract. While the court considers 21.00% an exorbitantly high interest rate,

---

Truck's mileage, condition and options. AIB, on the other hand, provided a NADA Value that was current as of January 17, 2002. While the proper date for valuation in this instance is the effective date of the Plan, and while the court has ready access to current issues of the sources used by the parties, it will rely on the values argued by AIB and Debtors in deciding this case.

**15.** *Rash*, 520 U.S. at 965 n. 6, 117 S.Ct. 1879.

**16.** The court could alternatively use the KBB Value as the starting point if it had before it evidence of the limited markup a dealer would apply to its cost of the vehicle in a pass-through transaction.

**17.** This midpoint assumes Debtors' hypothetical dealership seller would acquire the vehicle for the KBB Value and that the dealer's mark-up, without add-ons such as those referred to in footnote 6 to *Rash*, would raise the cost to Debtors half-way to the retail price. The court recognizes used cars are typically bought by dealers at auction at a lower price than the KBB Value. Purchases at auction, however, may include other inherent costs which are reasonably accounted for by using the KBB Value.

**18.** As a guide for future automobile valuations, the court believes the NADA Value, discounted appropriately to account for the admonition in footnote 6 to *Rash*, represents a reasonable valuation for purposes of determining a secured creditor's claim in a cram-down situation. The methodology used here by the court satisfactorily approximates such a calculation in the absence of evidence of *Rash's* required reduction of the retail value (*i.e.*, the NADA Value).

controlling precedent supports AIB's position.

■ Section 1325(a)(5)(B)(ii) provides that the bankruptcy court shall confirm a plan, if, with respect to each allowed secured claim "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." [19] This provision requires the debtor to provide each holder of an allowed secured claim "with payments, over the life of the plan, that will total the present value of the allowed secured claim." [20] With respect to the interest rate to which a crammed-down secured creditor is entitled, the Fifth Circuit Court of Appeals has adopted a rebuttable presumption in favor of the contract rate agreed to by the parties before bankruptcy. [21] Absent an affirmative showing by either party that the contract rate is not reflective of the rate the lender would have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk, the contract rate controls.

■ While the court suspects AIB's cost of funds has decreased dramatically since it entered into the Contract with Debtors in 1999, and while a showing of that alone could rebut the *Smithwick* presumption (since it would indicate AIB concomitantly lends at lower rates), absent evidentiary support the court's general awareness of changes in interest rates is insufficient to controvert the rebuttable presumption in favor of the rate agreed to by the parties in the Contract. Accordingly, the court holds Debtors must pay the Contract rate of 21.00% on AIB's secured claim.

## C. A Chapter 13 Plan May Provide for Lien Releases

[8] The next issue the court must address is whether a chapter 13 plan may require surrender by an undersecured creditor of its lien upon full payment of its secured claim but prior to the debtor's discharge. [22] Dispute over this question has focused on the interpretation of section 506(d) in *Dewsnup v. Timm*. [23] In *Dewsnup*, the Supreme Court construed the term "not an allowed secured claim" in the clause, "[t]o the extent that a lien secures a claim ... that is not an allowed secured claim such lien is void." [24] Concluding that section 506(d) referred to a claim disallowed under section 502, rather than the unsecured portion of an undersecured creditor's claim as determined pursuant to section 506(a), the Court held that a chapter 7 debtor could not use section 506(d) to strip down a secured creditor's lien to the value of its collateral. [25]

The majority of the courts addressing strip down in chapter 13 cases have taken the position that *Dewsnup* is not controlling because of footnote 3 to the Supreme

19. 11 U.S.C. § 1325(a)(5)(B)(ii).

20. *Associates Commercial Corp. v. Rash*, 520 U.S. at 953, 956, 117 S.Ct. 1879, 1880–81, 138 L.Ed.2d 148 (1997); *Green Tree Financial Servicing Corp. v. Smithwick*, 121 F.3d 211, 213 (5th Cir.1997).

21. *Smithwick*, 121 F.3d at 215.

22. Numerous courts have addressed this issue. *See e.g., In re Zakowski*, 213 B.R. 1003 (Bankr.W.D.Wis.1997), *In re Pruitt*, 203 B.R. 134 (Bankr.N.D.Ind.1996); *Bank One, Chica-*

*go, N.A. v. Flowers*, 183 B.R. 509 (N.D.Ill. 1995); *In re Cooke*, 169 B.R. 662 (Bankr. W.D.Mo.1994). The Supplemental Brief and the Reply Brief provided the court with a thorough review of the case law.

23. 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

24. *Dewsnup*, 502 U.S. at 415, 112 S.Ct. at 777.

25. *Id.*, 502 U.S. at 417, 112 S.Ct. at 778.

Court's opinion.[26] A minority of courts, including this court in an opinion by Hon. Harold C. Abramson, have declined to accept this reasoning.[27]

The first step for this court is to define the precise issue before it. Despite the attention devoted in *Thompson* and the cases it cites to the issue of whether liens may be stripped down in chapter 13, there really is no disagreement among the courts that strip down in chapter 13 is possible.[28] The issue, rather, is when strip down may be effective. In turn, the narrow question this court now confronts is whether a chapter 13 plan is confirmable if it contains a provision requiring an undersecured lender to release its lien after payment of the value of its collateral but before the debtor completes all payments under the plan. The answer to this question lies in the proper reading of the Bankruptcy Code,[29] specifically those provisions dealing with the formulation and confirmation of a chapter 13 plan.

■ For a provision of a plan to render the plan not confirmable, it must violate one of the tests of confirmation found in section 1325. Section 1325(a)(1) requires that "the plan compl[y] with the provisions of ... chapter [13] and with other applicable provisions of ... title [11]." The principal provision in chapter 13 with which a proposed plan must comply is section 1322, which describes the required and permitted terms for a plan. Nothing in section 1322 prohibits inclusion in a plan of a term requiring lien releases, and section 1322(b)(10) provides that a plan may "include any ... appropriate provision not inconsistent with ... title 11."

Section 1322(b)(9) permits a plan to "provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity...." When read together with sec-

---

26. In footnote 3, the Court explicitly declined to opine whether the words "allowed secured claim" had a different meaning in other sections of the Bankruptcy Code. *Id.*

27. *See In re Thompson,* 224 B.R. 360 (Bankr. N.D.Tex.1998). Though it arrives by another avenue at a different result, this court does not disagree with Judge Abramson's underlying analysis. In the view of this court, Judge Abramson correctly rejected the reasoning of those cases relying on footnote 3 of *Dewsnup* because the context in which footnote 3 appears makes clear that it was not intended to permit a different construction of section 506(d) to allow its use for lien stripping in other chapters. Rather, the Court simply meant that the words "allowed secured claim" might have different meanings in other provisions of the Bankruptcy Code. This court believes the latter is true of the term "allowed secured claim" in section 1325(a)(5).

Judge Abramson further concluded that chapter 13 contemplated a bargain between a debtor and his creditors that had to be completed prior to lien stripping being effective. This rationale is addressed below.

28. *See* 11 U.S.C. § 1322(b)(2), 1325(a)(5)(B). *See e.g. Associates Commercial Corp. v. Rash,* 520 U.S. 953, 965, 117 S.Ct. 1879, 1886, 138 L.Ed.2d 148 (1997) (holding that, under section 506(a), the value of property retained because the debtor has exercised the cram down option is the cost the debtor would incur to obtain a like asset for the same proposed use; with the amount by which a creditor's secured claim exceeds such amount (if any) thereby rendered an unsecured claim); *Nobelman v. American Savings Bank,* 508 U.S. 324, 327–28, 113 S.Ct. 2106, 2109, 124 L.Ed.2d 228 (1993) (noting that secured claims (other than those held by homestead mortgages) are subject revaluation under sections 506(a) and 1322(b)(2)).

29. The first and principal source for resolving questions of bankruptcy law is the Bankruptcy Code. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

tions 1327(b) and (c),[30] section 1322(b)(9) appears to allow confirmation of a plan that provides for lien releases upon payment of the value of the lienholder's collateral. Indeed, such a term would not only fall within section 1322(b)(10) but would seem a logical part of a chapter 13 plan given section 1322(b)(9).

As to other provisions of chapter 13, a plan which provides for lien releases before completion of payments arguably might be contrary to section 1322(b)(2) when read in conjunction with section 1325(a)(5)(B)'s requirements for treating secured claims. Courts (including *Thompson*) have also opined that required pre-discharge lien releases are not permissible as a result of section 1328.

Section 1325(a)(5)(B) requires (absent a secured creditor's acceptance or surrender of the collateral) that a holder of an "allowed secured claim" (1) "retain the lien securing such claim;" and (2) receive value on account of such claim of "not less than [its] allowed amount." In construing section 1325(a)(5)(B), the term "allowed secured claim" must be assigned a different meaning than that given it in section 506(d) by the *Dewsnup* court.[31] If it retains the meaning used in *Dewsnup* (i.e., the allowed amount of the claim itself), lien stripping becomes impossible: any plan that fails to give a secured creditor the full value of its underlying allowed claim would fail the test of section 1325(a)(5)(B). Under such a construction, any plan that effected lien stripping at any time—whether prior to or upon completion of payments—would violate the requirement that the allowed amount of the claim be paid. Thus, finding in sections 1322(b)(2) and 1325(a)(5)(B) a basis for denying confirmation of a plan containing a lien release provision would require a determination that those sections prohibit strip down absolutely.

Moreover, such a construction would run counter to sections 506(a) and 1322(b)(1). Under section 506(a), the undersecured creditor in chapter 13 will participate in the debtor's plan by reason of both an unsecured claim and a secured claim. Section 1322(b)(1) allows division of unsecured claims into classes under a plan but also requires that classes not be discriminated against unfairly. If sections 1322(b)(2) and 1325(a)(5)(B) are read to prohibit strip down, the unsecured claim of the undersecured creditor would have to be paid in full regardless of the return on other unsecured claims. This would amount to the sort of discrimination section 1322(b)(1) is intended to prevent.[32]

---

30. Sections 1327(b) and (c) state:
    (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.
    (c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.
    The plain meaning of section 1327(c), applied to the case at bar, is that, upon confirmation ownership of the Truck will vest in Debtors subject only to AIB's secured claim.

31. This application of footnote 3 of *Dewsnup* is consistent with Judge Abramson's reading. *Thompson*, 224 B.R. at 364.

32. The absence in chapter 13 of provisions similar to sections 1111(b) and 1124 (as well as the requirement in chapter 13 that every plan, as opposed to just cram-down plans under section 1129(b)(1), not discriminate unfairly) suggests Congress did not intend an undersecured creditor to receive full payment at the expense of other unsecured creditors. The chapter 13 debtor (unlike the chapter 11 debtor) is not left with the option of leaving the undersecured creditor unimpaired (treatment in the form of cure and reinstatement of the parties' bargain would fall under section 1325(a)(5)). Likewise, unlike a secured credi-

388

A statute must be read in a manner that gives the fullest effect to all its provisions.[33] This court therefore concludes that sections 1322(b)(2) and 1325(a)(5)(B) do not prevent lien strip down. Since these sections do not contain any requirement as to when strip down may be effective, the court holds that they do not prevent confirmation of a plan provision requiring release of a lien upon payment of the secured portion of the lender's claim.

Some courts have found in the discharge provisions of section 1328 reason for not permitting lien release clauses like the one at issue.[34] Nothing in that provision, however, specifically prohibits a mandatory release of liens prior to completion of a plan. This alone would be sufficient basis for concluding such a term is not inconsistent with section 1328 and so is permissible pursuant to section 1322(b)(10). Cognate sections in other chapters add weight to this conclusion.

Congress could have paired the vesting provisions triggered through chapter 13 plans with discharge (as section 1141 does with chapter 11 plans), had it intended that lien stripping be ineffective (or subject to limitation) until discharge. Instead, while section 1328 defers a debtor's discharge until completion of payments under the plan, section 1327 provides for vesting of property of the estate in the debtor upon confirmation free of claims except as specified in the plan. That the statute is so structured indicates Congress did not in-tend that strip down of a lien could only be effective after completion of payments by a debtor under the plan.

The argument that the benefits afforded a debtor by chapter 13, including lien stripping, are delayed until discharge because of the extraordinary breadth of the chapter 13 discharge is not persuasive. The same delay of discharge exists in chapter 12,[35] but the discharge in a family farm case, unlike that in chapter 13, is limited to debts dischargeable in chapter 7. Moreover, for a nonindividual debtor, the discharge in chapter 11,[36] effective at confirmation, is even broader than that provided by section 1328.[37] In sum, section 1328 offers no basis for denying confirmation of a plan containing a term requiring that liens be released prior to discharge.

As to meeting section 1325(a)(1)'s requirement that the plan comply with other applicable provisions of title 11, a lien release clause could only fall afoul of section 506 or section 349. That section 506 is not inconsistent with a chapter 13 plan provision releasing liens has already been shown: if such a provision is inconsistent with section 506, it can only be because lien stripping itself is inconsistent with the statute. Once lien stripping is accepted as permissible, section 506 does not affect when it occurs.

That leaves the possibility that a plan requiring release of liens is inconsistent with section 349.[38] The court concludes

---

tor in chapter 11, the creditor in chapter 13 may not elect to forfeit its unsecured claim and rely on its collateral.

**33.** *Duke v. University of Texas at El Paso,* 663 F.2d 522, 526 (5th Cir.1981); *Heitkamp v. Dyke (In re Dyke),* 943 F.2d 1435, 1442 (5th Cir.1991); *In re Cameron,* 274 B.R. 457, 460 (Bankr.N.D.Tex.2002).

**34.** *In re Thompson,* 224 B.R. at 365–66; *In re Scheierl,* 176 B.R. 498, 504–05 (Bankr. D.Minn.1995).

**35.** *See* 11 U.S.C. § 1228.

**36.** *See* 11 U.S.C. § 1141.

**37.** *See* 11 U.S.C. § 1141(d).

**38.** Under section 348, in a converted chapter 13 case a lien on collateral becomes void upon payment of the value of the collateral

section 349 does not bar the type of clause at issue. In the first place, the court can tailor an order dismissing a chapter 13 case to suit the situation.[39] Upon dismissal the court may direct reinstatement of liens released pursuant to the plan.[40] Moreover, in the absence of discharge, the debtor will remain personally liable to the creditor following dismissal. These two aspects of dismissal more than offset the disadvantages cited in *Thompson* that are faced by the (formerly) secured creditor with a stripped lien.[41]

Considering the specific language of sections 1322(b)(10), 1325(a)(1) and 1327, the court concludes a provision requiring release of liens upon payment of collateral value is a permissible term in a chapter 13 plan. The court finds further support in *Thompson's* reasoning that, before discharge, a debtor may use section 363 of the Bankruptcy Code to dispose of a creditor's collateral for which full payment has been made under the plan.[42] If such a result may be accomplished post-confirmation and pre-discharge pursuant to section 363, there is no logical reason to prohibit a debtor from anticipating it in the plan.

In the court's view, the primary difference between its conclusion and that reached by Judge Abramson in *Thompson* is not one of legal substance but rather which party will have the burden of acting in a strip down situation. Whether it might make more sense for a debtor to

bear that burden, Congress did not leave the court the option of excluding from debtors' plans clauses requiring secured creditors to release their liens upon payment of the value of their collateral. Accordingly, this court holds that a chapter 13 plan may require that a secured creditor release its liens upon payment in full of the amount of the secured portion of its claim.

## IV. Conclusion

The court has considered the evidence and arguments presented at the Hearing, and has carefully reviewed the Supplemental Brief, the Reply Brief, the Bankruptcy Code and applicable case law. In light of the foregoing, the court hereby values the Truck, and so AIB's secured claim, at $5,745.00, and determines Debtors must provide AIB an interest rate of 21.00% on its claim. Finally, the court can find no prohibition against including in the Plan a provision requiring AIB to release its lien against the Truck upon Debtors' satisfaction of AIB's $5,745.00 secured claim. Debtors are, therefore, permitted to include such a provision in the Plan. To the extent the Plan is inconsistent with the foregoing, Debtors are granted leave to amend.

It is so ORDERED.

---

whether or not the debtor completes payments under the plan. Section 348(f), added to the Bankruptcy Code in 1994, would effect release of the creditor's lien once the value of the collateral, as determined in the chapter 13 case, has been paid. This provision suggests lien stripping depends principally upon payment of collateral value.

**39.** *See* 11 U.S.C. § 349(b).

**40.** Though dismissal must occur in certain circumstances and may be ordered *ex parte*

(section 1307(b); *Thompson*, 224 B.R. at 366–67), the court may require notice of the motion to dismiss (Fed. R. Bankr.P. 1017(f)(2) and 9007). This affords creditors that have released liens an opportunity to ask the court to order reinstatement. Alternatively, the court may elect on its own motion to reinstate liens in a dismissal order entered *ex parte*.

**41.** 224 B.R. at 366–67.

**42.** 224 B.R. at 367.