**In re Luis GONZALEZ, Jr., Debtor.**

No. 02–B–48045.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 27, 2003.

Michael C. Burr, Robert J. Adams & Associates, Chicago, IL, for Debtor.

Christopher H. Purcell, Sherman & Sherman, Chicago, IL, for Ford Motor Credit Company.

### MEMORANDUM OPINION AND ORDER

A. BENJAMIN GOLDGAR, Bankruptcy Judge.

This matter is before the court on the objection of Ford Motor Credit Company to the confirmation of debtor Luis Gonzalez, Jr.'s chapter 13 plan.

FMCC, a creditor, took a security interest in Mr. Gonzalez's van in return for the loan that allowed Mr. Gonzalez to buy the van. In his most recently tendered plan, Mr. Gonzalez proposes to keep the van and pay FMCC $1,000 as the value of the van—and therefore the value of FMCC's security interest—pursuant to 11 U.S.C. § 1325(a)(5)(B). FMCC objects to confirmation of the plan on the ground that $1,000 is not the van's value. In March, the court held an evidentiary hearing on FMCC's objection, after which the parties filed post-hearing memoranda.

The court now makes the following findings of fact and conclusions of law and determines that the value of the van is $2,411. The objection will therefore be sustained.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(K) and (L).

### 2. Background

The van sparking the controversy is a 1996 Ford Windstar GL minivan. It has seen better days. The van has 103,335 miles on it, high mileage for this make and model. The body shows considerable minor damage: deep scratches on both bumpers, a large dent in the left rear quarter panel (near the gas tank), a small dent in the trunk and another in the right rear side door. One of the doors does not close properly. The left front turn signal is broken. The van starts, and it moves once started, but the "check engine" and "ABS" lights on the dashboard come on and remain on. It is unclear why.

Mr. Gonzalez bought the van from a suburban Chicago Ford dealer on February 7, 2001 for a cash price of $9,900.[1] The contract, which was admitted into evidence, does not describe the car's condition or mileage at the time of sale. The contract does show that on top of the cash price, Mr. Gonzalez paid $1,495 for something called "EXTSERVCONT," which the parties translated to mean an extended service contract. That contract, however, was not introduced at the hearing.

Not surprisingly, the parties hold rather different views on the van's value. Mr. Gonzalez contends that given its condition, the van has a value of no more than $325–even less than the $1,000 value assigned in his plan. FMCC asserts that despite its condition, the van has a value of $7,495.

To support his valuation, Mr. Gonzalez presented the testimony of Akin Ojuluwayo, an experienced used car dealer who regularly buys, sells, and appraises cars. In January 2003, Mr. Ojuluwayo inspected

---

**1.** Mr. Gonzalez bought the van not quite two years before he filed bankruptcy: he filed his chapter 13 petition on December 6, 2002.

Mr. Gonzalez's van for the purpose of giving an opinion in this case.

As a preface to his opinion, Mr. Ojuluwayo described three standard publications listing the values of used cars: the Black Book, the Kelley Blue Book, and the National Automobile Dealers Association ("NADA") guide. The Black Book, he said, places a vehicle for a particular model year in one of four classes depending on its condition and then provides a price. These are wholesale prices based on the prices dealers pay for cars at auctions. Mr. Ojuluwayo testified that consumers are unable to attend these auctions and cannot obtain Black Book prices. Rather, he said, they pay the Black Book price plus a standard dealer markup of 20%.

Like the Black Book, the Kelley Blue Book classifies vehicles based on their condition. It, too, gives wholesale prices, and Mr. Ojuluwayo said the prices generally correspond to those in the Black Book.

The NADA guide, meanwhile provides both a wholesale and a retail price for each vehicle. Unlike Black Book and Kelley Blue Book prices, however, NADA prices do not vary with the vehicle's condition. The NADA guide assumes that all vehicles are, as Mr. Olujuwayo put it, "extra clean." Consequently, the prices in the NADA guide are typically higher than prices in the Black Book or Kelley Blue Book.

Relevant pages from the Black Book and Kelley Blue Book were admitted into evidence. For a 1996 Ford Windstar GL in "rough" condition—the condition of Mr. Gonzalez's van, according to Mr. Ojuluwayo—the December 2002 Black Book listed a value of $1,775. The Kelley Blue Book for January 2003 said a 1996 Ford Windstar GL in "poor" condition (compa-rable to the Black Book's "rough" condition) had "no value."

Based on his inspection of Mr. Gonzalez's van, Mr. Ojuluwayo opined that the van had a "replacement value" (his term) of $325. He reached that figure by taking the Black Book's $1,775 wholesale value as his starting point. From that, he deducted $1,500 for repairs—an amount he described as conservative and probably insufficient even to perform needed body work—to reach $275. He then added what he said was a customary markup of 20%, or about $50, to arrive at $325.[2]

FMCC offered no witnesses to support its valuation but relied solely on the NADA guide and the contract Mr. Gonzalez signed when he bought the van. The NADA guide for December 2002, the relevant page of which was admitted into evidence, listed the van's retail value as $6,000. To that figure, FMCC added the $1,495 price of Mr. Gonzalez's extended service contract, resulting in a total value of $7,495.

### 3. Analysis

The valuation issue arises here because of the Code's treatment of secured claims and section 13 plans. Section 506(a) bifurcates a secured creditor's "allowed claim" into two portions: a portion deemed secured "to the extent of the value of such creditor's interest in the estate's interest in such property," and an unsecured portion consisting of the balance. 11 U.S.C. § 506(a). Under section 1325 of the Code, a chapter 13 debtor can keep property securing a creditor's claim, even over the creditor's objection, if the debtor's plan provides for payment of the present value of the "allowed amount" of the claim—the

---

**2.** Because NADA retail figures assume a vehicle in "extra clean" condition, Mr. Ojuluwayo considered them unhelpful. If called upon to do so, however, Mr. Ojuluwayo said he would assign a retail value to the van of $825. He reached the $825 figure by taking his $325 "replacement value" and adding $500 to cover fees, storage, reconditioning, and warranty.

value, in other words, under section 506(a). *See* 11 U.S.C. § 1325(a)(5)(B)(ii).

Mr. Gonzalez wants to keep his van and so has invoked this "cram down" provision of the Code. The dispute between FMCC and Gonzalez concerns the value of the secured portion of FMCC's claim for purposes of section 506(a).

### a. The Proof of Claim Problem

The first question is whether valuation has to be addressed at all. The court's claims register does not list a proof of claim filed by FMCC in this case, and the claims bar date was April 23, 2003. At a status hearing on April 29, the court asked the parties whether the claims register was correct. FMCC's counsel promised to investigate whether FMCC had filed a proof of claim. At a status hearing the following week, he produced one—filed-stamped "May 1, 2003," eight days after the bar date.

■ Ordinarily, a secured creditor's failure to file a proof of claim would obviate any need to consider the creditor's valuation objection. Section 506(a) defines a secured claim as an "allowed claim." 11 U.S.C. § 506(a). Section 1325(a)(5) likewise applies only to an "allowed secured claim," 11 U.S.C. § 1325(a)(5), and when a debtor invokes the "cram down" provision under that section the creditor is protected only to extent of the value of "the allowed amount" of the claim, 11 U.S.C. § 1325(a)(5)(B)(ii). Section 502(a), in turn, provides that a "claim . . . proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest objects," 11 U.S.C. § 502(a), making clear that a claim is not "allowed" unless a proof of claim has been filed. *See In re Schaffer,* 173 B.R. 393, 396 (Bankr.N.D.Ill.1994).

■ Because a secured creditor must have an "allowed claim" to object to valuation, and because a claim is not "allowed" unless it is filed, a filed proof of claim is a prerequisite to a valuation objection under section 1325(a)(5)(B)(ii). *In re Linkous,* 141 B.R. 890, 895 (W.D.Va.1992), *aff'd on other grounds,* 990 F.2d 160 (4th Cir.1993) *In re Stewart,* 247 B.R. 515, 520 (Bankr. M.D.Fla.2000); *In re Dennis,* 230 B.R. 244, 252 (Bankr.D.N.J.1999); 8 L. King, *et al., Collier on Bankruptcy* ¶ 1325.06[1][a] at 1325–23 (15th ed.2002).

■ For two reasons, however, FMCC is entitled to pursue its objection to the valuation of Mr. Gonzalez's van despite the apparent proof of claim problem. First, a document not actually intended as a proof of claim (and so not labeled "proof of claim" or consisting of the official form) will sometimes be taken as an "informal proof of claim." *In re Bargdill,* 238 B.R. 711, 717 & n. 2 (Bankr.N.D.Ohio 1999); 9 L. King, *et al., supra,* ¶ 3001.05[1] at 3001–11. The "informal proof of claim" concept is an "equitable doctrine developed by the courts to ameliorate strict enforcement of the claims bar date." *In re Wigoda,* 234 B.R. 413, 415 (Bankr.N.D.Ill.1999), *aff'd without op.,* 11 Fed.Appx. 624 (7th Cir. 2001).

■■ To constitute an informal proof of claim, a document must (1) have been timely filed with the court and become part of the record; (2) state the existence and nature of the debt; (3) state the amount of the claim; and (4) evidence the creditor's intent to hold the debtor liable. *Wigoda,* 234 B.R. at 415; *see also In re Plunkett,* 191 B.R. 768, 774 (Bankr. E.D.Wis.1995) (adding that the allowance of the claim must also "be equitable under the facts of the case"), *aff'd,* 82 F.3d 738 (7th Cir.1996). An informal proof of claim may then "become the basis for an amended proof of claim." *Wigoda,* 234 B.R. at 415.

■ FMCC's objection to confirmation meets these requirements. The objection was filed with the court in February, well before the bar date, and is part of the record. It states the existence and nature of the debt, a loan secured by Mr. Gonzalez's van. It provides the amount of the claim: "$10,311.37 at 24.95 percent interest." [3] And the objection rather obviously manifests FMCC's intent to hold Mr. Gonzalez liable—otherwise, there would have been no point in filing it. When the necessary elements are present, objections to confirmation have been treated as informal proofs of claims. *See, e.g., Joiner*, 93 B.R. at 133–34; *In re Ungar*, 70 B.R. at 521–23. That is how FMCC's objection should be treated here.

■ It is worth noting, finally, that FMCC could press its valuation objection even if the objection to confirmation were not considered an informal proof of claim. FMCC did eventually file a proof of claim—one using the official form and denominated as such—on May 1, 2003. Although that proof of claim was filed after the bar date and so was untimely, *see* Fed. R. Bankr.P. 3002(c),[4] and although late proofs of claims in chapter 13 cases are disallowed, *see* 11 U.S.C. § 502(b)(9); *see generally Dennis*, 230 B.R. at 246–50, claims are disallowed as late only "if objection to the claim is made" on that ground, 11 U.S.C. § 502(b); *see Dennis*, 230 B.R. at 249 (concluding that late proof claim "to which an objection has been raised on

tardiness" must be disallowed). Mr. Gonzalez has not objected to FMCC's late-filed proof of claim.

Whether because FMCC's objection to confirmation amounted to a timely, informal proof of claim, or because FMCC's untimely May 1 proof of claim stands without objection, FMCC has an "allowed" proof of claim in this case.[5] 11 U.S.C. § 501(a). FMCC therefore had the right under section 1325(a)(5)(B)(ii) to complain about the van's valuation.

### b. *Rash* and its Aftermath

■ In *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the Supreme Court settled—or tried to settle—the question of how security interests should be valued under section 506(a) when a chapter 13 debtor exercises his "cram down" option under section 1325(a)(5)(B). The Court rejected two approaches the courts of appeals had employed: a "ruleless approach" that varied with each case, *id.* at 964 n. 5, 117 S.Ct. 1879, and a "split-the-difference approach" using "the midpoint between foreclosure and replacement values," *id.* at 964, 117 S.Ct. 1879. Recognizing the need for "a simple rule of valuation," *id.* at 965, 117 S.Ct. 1879 (internal quotation omitted), the Court instead approved a "replacement-value standard." *Id.* at 962–63, 117 S.Ct. 1879. "Replacement value," the Court said, meant "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain

---

**3.** Not all courts insist that an informal proof of claim disclose the amount of the claim. *See In re Joiner*, 93 B.R. 130, 134 (Bankr. N.D.Ohio 1988); *In re Ungar*, 70 B.R. 519, 522 (Bankr.E.D.Pa.1987). *Wigoda*, however, takes the contrary view. *See Wigoda*, 234 B.R. at 416.

**4.** Rule 3002(c) provides five relatively narrow exceptions from the timeliness requirement. *See* Fed. R. Bank. P. 3002(c)(1)-(5). FMCC's

proof of claim does not satisfy any of the exceptions.

**5.** A document held to be an informal proof of claim must always be amended with a formal proof of claim. *Pizza of Hawaii, Inc. v. Shakey's Inc.*, 761 F.2d 1374, 1381–82 (9th cir. 1985); *Wigoda*, 234 B.R. at 415. FMCC's May 1 proof of claim will serve as the formal amendment to FMCC's earlier, informal proof of claim.

property of like age and condition." *Id.* at 959 n. 2, 117 S.Ct. 1879.

In its now-famous footnote six, the Court in *Rash* left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented," noting that "[w]hether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id.* at 965 n. 6, 117 S.Ct. 1879. The Court added, however, that replacement value should not "include certain items." *Id.* When the replacement value of a vehicle "is its retail value," the Court said, the creditor should not receive "the value of items the debtor does not receive when he retains his vehicle," such as "warranties, inventory storage, and reconditioning." *Id.*

*Rash* has come in for its share of criticism, mainly because of footnote six. *See, e.g.,* 2 K. Lundin, *Chapter 13 Bankruptcy* § 109.1 at 109–1 (3rd ed.2000) (observing that *Rash* articulated a standard that is "neutralized by adjustments in the footnotes"). In particular, footnote six is claimed to contradict footnote five. Footnote six, critics assert, establishes the very fact-dependent, case-by-case approach that footnote five declares objectionable. The result is said to be a decision of "perfect ambiguity." J. Braucher, *Getting it for You Wholesale: Making Sense of Bankruptcy Valuation of Collateral after Rash,* 102 Dick. L.Rev. 763, 764, 771 (1998) (calling footnotes five and six "nonsensical").

In the wake of *Rash,* moreover, many courts have taken the decision's perceived ambiguity as an opening to adopt convenient rules or benchmarks, at least as "starting points," for deciding valuation. These rules vary widely. Some courts begin with a retail value or a discounted retail value. *See, e.g., In re Gray,* 285 B.R. 379, 384 n. 18 (Bankr.N.D.Tex.2002); *In re Renzelman,* 227 B.R. 740, 742 (Bankr.W.D.Mo.1998) (retail minus 5%). Others employ an average of retail and wholesale values, *see, e.g., In re Getz,* 242 B.R. 916, 919 (6th Cir. BAP 2000); *In re Marquez,* 270 B.R. 761, 766 (Bankr.D.Ariz. 2001), despite the disapproval of this method in *Rash,*[6] *see Rash,* 520 U.S. at 964, 117 S.Ct. 1879. One commentator has advocated using wholesale values. *See* J. Braucher, *supra,* at 783.

Putting aside the rectitude of what these courts have done, their premise for doing it is false. *Rash* may be vague, even difficult to implement (the Court did not establish a "simple rule"), *see generally* 2 K. Lundin, *supra,* at §§ 109.1–110.1, but the decision is not ambiguous. Footnotes five and six do not conflict. In footnote five, the Court objected to a "ruleless approach" that allowed the *"use of different valuation standards* based on the facts and circumstances of individual cases." *Rash,* 520 U.S. at 964 n. 5, 117 S.Ct. 1879 (emphasis added). In footnote six, however, the Court did not then approve the use of "different valuation standards" in every case; rather, it acknowledged that implementing the *proper* valuation standard— "replacement value"—would vary from case to case depending on "the evidence presented." *Id.* at 965 n. 6, 117 S.Ct. 1879.

*Rash* is not so opaque that it gives no guidance, and what guidance it gives precludes the expedient use of uniform starting points, benchmarks, polestars, shortcuts, and rules of thumb. Replacement

---

**6.** These courts justify averaging in the face of *Rash* on the ground that the average is only a "starting point" for valuation. *See, e.g., Getz,* 242 B.R. at 919. Other courts have rightly criticized this procedure as inconsistent with *Rash. See Evabank v. Baxter,* 278 B.R. 867, 877–78 (N.D.Ala.2002).

value, the Court said, is the price a willing buyer "in the debtor's trade, business or situation" would pay for property "of like age and condition." *Rash*, 520 U.S. at 959 n. 2, 117 S.Ct. 1879. Replacement value depends on "the type of debtor and the nature of the property." *Id.* at 965 n. 6., 117 S.Ct. 1879; *see In re Ruiz*, 227 B.R. 264, 266 (Bankr.W.D.Tex.1998); *In re McCutchen*, 224 B.R. 373, 374–75 (Bankr. E.D.Mich.1998); 2 K. Lundin, *supra*, at § 110.1.

*Rash* makes clear, then, that replacement value can only be determined under the specific facts of each case. Unvarying, across-the-board rules, even as "starting points," are impermissible. *See Evabank*, 278 B.R. at 877–78 (decrying the "twisting of *Rash*" to permit the use of a "cookie-cutter valuation procedure" and holding that valuation depends on "the evidentiary facts of each case"); *In re Winston*, 236 B.R. 167, 171 (Bankr.E.D.Pa.1999) (concluding that "establishment of a set formula" for use in every case is inconsistent with *Rash* and that the facts of each case must be examined).

### c. The Van

Employing *Rash's* case-by-case approach and so eschewing any rote starting point, the issue here is what a willing buyer in Mr. Gonzalez's "trade, business or situation" would pay a willing seller to buy the specific van in question (warts and all), based on the relatively scant evidence presented at the hearing.

About Mr. Gonzalez's "trade, business or situation," unfortunately, we know nothing: he did not testify. So the record does not disclose who he is, where he lives, where he works, or how he uses his van. The only evidence about markets to which he might have access is the contract he signed with a local Ford dealer to buy the van, paying $9,900 roughly two years ago. About the van, on the other hand, more is

known. Almost seven years old, it has more than 100,000 miles on it, needs considerable body work, and may (or may not) require major repairs to the engine and brakes.

With the evidence about Mr. Gonzalez limited to his original contract to buy the van from a retailer, the court concludes that Mr. Gonzalez would buy at retail. Therefore, the appropriate starting point in this case is a retail value. The $9,900 price Mr. Gonzalez originally paid, however, is almost two years old and so of marginal relevance. *Cf. In re Coles*, 252 B.R. 66, 68 (Bankr.E.D.Va.1999) (finding sales contract signed two and a half months before bankruptcy filing not only relevant but conclusive of value). That leaves the NADA guide's figure of $6,000 as the only indication of the van's retail value.

The NADA guide, however, assumes a car in "extra clean" condition, which the van here obviously is not, and it also includes other items *Rash* said should be deducted: "warranties, inventory storage, and reconditioning," *Rash*, 520 U.S. at 965 n. 6, 117 S.Ct. 1879. *See Gray*, 285 B.R. at 384 (NADA value includes commissions, reconditioning, storage, and a limited warranty); *McCutchen*, 224 B.R. at 373 (NADA value should be reduced by any applicable high mileage deduction, any reconditioning or repair costs, and any cost of warranty); *In re Younger*, 216 B.R. 649, 656 (Bankr.W.D.Okla.1998) (NADA value includes costs of inventory storage and recondition, items that should be deducted).

The deductions here total $3,589. According to the NADA guide itself, the van here should receive a $1,500 high mileage deduction. Another $1,589 should be deducted for the cost of repairs: $1,500 for body work, plus $79 Mr. Ojuluwayo said it would cost to have a mechanic examine the

car to investigate why the dashboard warning lights are on. Mr. Ojuluwayo also testified that reconditioning, storage costs and a warranty would total approximately $500; that amount, too, should be deducted. Reducing the NADA $6,000 retail value by $3,589 results in a value of $2,411.

This figure is not close to the valuation of either party, but neither of the parties' proposed valuations comports with *Rash.* FMCC premises its valuation on the $6,000 NADA retail value without considering the particular vehicle at issue or making the deductions *Rash* requires for items Mr. Gonzalez "does not receive" when he retains the vehicle. *Rash,* 520 U.S. at 965 n. 6, 117 S.Ct. 1879. To the NADA value, FMCC also adds the $1,495 Mr. Gonzalez paid for the extended service contract. But even assuming a contract of that kind should be considered part of a vehicle's value, the contract here was never introduced as an exhibit, so there is no evidence that it is still in effect. (Even if it is, the passage of time has certainly reduced its value below the original $1,495 by some indeterminate amount.)

Mr. Gonzalez's $325 valuation is equally unsatisfying. The valuation starts with the "Black Book" $1,775 wholesale value, deducts $1,500 for repairs, and then adds a $50 dealer markup. But Black Book values, Mr. Ojuluwayo said, are drawn from auction prices available to dealers, not consumers like Mr. Gonzalez. Black Book values are also wholesale values, and there was no evidence that Mr. Gonzalez has access to any market other than retail. Since valuation under *Rash* depends on this "type of debtor" and his "trade, business or situation," *Rash,* 520 U.S. at 959 n. 2, 965 n. 6, 117 S.Ct. 1879, and since there was no showing that this particular debtor can get a Black Book price or buy wholesale, starting with a wholesale value is improper.[7] *See In re Jones,* 219 B.R. 506, 508 (Bankr.N.D.Ill.1998) (declining to use wholesale value in absence of evidence showing debtor's access to wholesale market).

Although Mr. Ojuluwayo offered as an alternative a retail value of $825, that value makes little sense. Mr. Ojuluwayo reached $825 by taking the Black Book $1,775 wholesale value for a van in "rough" condition and then *deducting* $1,500 for repairs before adding a 20% dealer markup. But because *Rash* demands consideration of "property of like age and condition," *Rash,* 520 U.S. at 959 n. 2, 117 S.Ct. 1879—in this case a 1996 Ford Windstar GL van in "rough" condition—the cost of repairs should never have come into play in Mr. Ojuluwayo's bottom-up analysis. To arrive at a retail value using his assumptions, it would have been necessary only to add a 20% markup to the Black Book price. The result would be $2,130— virtually the same as the court's $2,411 value.

7. Noting the $3,678 value Mr. Gonzalez gave the car in the schedules to his bankruptcy petition, FMCC argues that Mr. Gonzalez is judicially estopped to advance any other value. Not so. Judicial estoppel bars a party from taking a position in litigation when the party has previously taken a contrary position and prevailed. *See New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Assuming a value in petition schedules is a "position" in litigation for purposes of judicial estoppel, Mr. Gonzalez did not previously prevail on the $3,678 valuation. Valuation is the issue now before the court.

Because schedules are typically "prepared in haste without much thought being given to the values reflected therein," those values merely have evidentiary value as admissions and are not conclusive. *In re Cobb,* 56 B.R. 440, 442 (Bankr.N.D.Ill.1985); *see also In re Hansen,* 95 B.R. 586, 589 (Bankr.C.D.Ill. 1989). The $3,678 value in the schedules is evidence to be considered, true enough. But it does not bind Mr. Gonzalez. Nor does it bind the court.

In light of the evidence presented, then, the court rejects the valuations offered by FMCC and by Mr. Gonzalez. The court finds that the van's value for purposes of section 1325(a)(5)(B) is $2,411.

#### 4. Conclusion

The objection of Ford Motor Credit Company to confirmation is sustained. The value of the debtor Luis Gonzalez, Jr.'s Ford Windstar GL van for purposes of 11 U.S.C. §§ 506(a) and 1325(a)(5)(B) is $2,411. Ford Motor Credit Company has a secured claim in the amount of $2,411 and an unsecured claim in the amount of $7,900.37.