**In re UAL CORPORATION, et al., Reorganized Debtors.**

**United Air Lines, Inc., Debtor, Plaintiff,**

**v.**

**UMB Bank, N.A., As Successor Trustee, Defendant.**

**Bankruptcy No. 02–B–48191.**
**Adversary No. 03–A–00977.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Aug. 24, 2007.

Marc Kieselstein, Alax L. Karan, Micah Marcus, Kristopher Ritter, Kirkland & Ellis LLP, Chicago, IL, for Plaintiff.

David A. Golin, Gesas, Pilati, Gesas and Golin Ltd, Arlene N. Gelman, Charles P. Schulman, Sachnoff & Weaver Ltd., Erich S. Buck, Reed Smith LLP, Mark F. Hebbeln, Gardner Carton & Douglas LLP, Chicago, IL, Joshua M. Mester, Hennigan Bennet Dorman LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

All that remains of this adversary proceeding is to determine one aspect of the treatment of a claim of UMB Bank, N.A. ("UMB") under the confirmed Chapter 11 plan of United Air Lines, Inc. ("United"). Although the plan specifically addresses UMB's claim, it deferred the resolution of several disputed matters, including the valuation of a leasehold that secures the claim. As discussed below, the evidence presented at a trial of this issue establishes that the value of the leasehold is $33,455,055. Accordingly, UMB's claim is

entitled to secured treatment under United's plan to that extent.[1]

## Jurisdiction

Title 28 U.S.C. § 1334(a) grants district courts exclusive jurisdiction over bankruptcy cases, but 28 U.S.C. § 157(a) allows these cases to be referred to a district's bankruptcy court. Under Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of all of its bankruptcy cases. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate) and (K) (proceedings to determine the extent of the validity, extent, or priority of liens). This court may therefore enter a final judgment.

## Findings of Fact

United operates at Terminals 7 and 8 at Los Angeles International Airport (LAX). It rents this space from the City of Los Angeles ("the City") pursuant to a Terminal Facilities Lease ("Terminal Lease") dated June 4, 1981. (United Ex. 5.) United improved the facilities at Terminals 7 and 8 in the early 1980s with the proceeds of bonds issued by the Regional Airports Improvement Corporation ("RAIC"), a governmental entity created by the City for this purpose. UMB is the current indenture trustee for these bonds. The bonds were sold to investors as part of a complex transaction involving United, RAIC, the City, and UMB's predecessor as indenture trustee. The transaction included, among other agreements, the following: (1) a Partial Assignment, (2) a

Facilities Sublease, (3) a Contingent Lease, and (4) several Indentures.

(1) In the Partial Assignment, United assigned to RAIC all of United's right and interest in the Terminal Lease "as it relates and applies to the RAIC Facilities." (UMB Ex. 10 at 2.) The "RAIC Facilities" are those facilities that were to be constructed with bonds to be issued by RAIC. (*Id.* at 2.) Exhibit A to the Partial Assignment lists the specific facilities that the parties anticipated would be constructed or modified with the bond proceeds. United and UMB have stipulated that these RAIC Facilities comprise a total of 345,167 square feet of new or substantially modified terminal space in Terminals 7 and 8. (Order and Stipulation entered on September 28, 2006; Adversary Docket No. 205.) United received no compensation for the assignment. (UMB Ex. 10.)

(2) RAIC then subleased precisely the same interest back to United through the Facilities Sublease. (United Ex. 7, 1–2, 5.) The rent to be paid by United for leasing back the right and interest it assigned to RAIC was the amount necessary to make payments on the bonds to be issued under the Indenture and to cover RAIC's expenses of administering the financing. (*Id.* at 4–5.) The Facilities Sublease contains a full set of default and remedy provisions, including an authorization for RAIC to remove United from the RAIC Facilities in the event of default and to "make efforts to relet the RAIC Facilities." (*Id.* at 19–23.) RAIC assigned its rights under the Facilities Sublease to the indenture trustee.

(3) In addition, through the Contingent Lease, RAIC obtained an option from the City to enter into a new terminal lease in the event United defaulted on the Termi-

---

1. This adversary proceedings was tried with two others (Nos. 05–A–01884 and 06–A–00698), which raise related questions regard-

ing UMB's claim. Those proceedings will be addressed in a separate decision.

nal Lease. (UMB Ex. 12.) The City guaranteed that the new lease would be on the same terms offered to United, and would extend for the remaining term of the Terminal Lease. This agreement essentially allowed RAIC to "step-into" United's entire leasehold interest in the event United defaulted on the Terminal Lease.

(4) Finally, RAIC also entered into the Indentures. (United Ex. 26–29.) These agreements generally provide (a) for the issuance of tax exempt bonds by RAIC, (b) for the indenture trustee to receive the proceeds of the sale of the bonds for purposes of funding construction of the RAIC Facilities, and (c) for the trustee to receive the rental payments from United under the Facilities Sublease for the purpose of paying the debt service on the bonds and ultimately redeeming them,

These integrated agreements resulted in the accumulation of $75,750,000 for the construction of the RAIC Facilities. (United Ex. 26 at 21; Ex. 27 at 7.)

In March of 2003 United brought this adversary, seeking a determination that the agreements constituted a secured financing arrangement, rather than a true lease. (Complaint at 7, Adversary Docket No. 1). The distinction is significant because a lease—as the Facilities Sublease purports to be—is treated differently from secured financing under the Bankruptcy Code. This court ruled in United's favor, finding that the arrangement in question was not a true lease, but was a secured financing arrangement—effectively a leasehold mortgage. This decision was based on the economic reality of the transaction: RAIC had no interest in the nominally subleased property other than as collateral. A failure by United to make the required bond payments would give UMB (as assignee of the Facilities Sublease) the right to take possession of the "subleased" property—the RAIC Facilities—and lease that property to another party; but in no other circumstance would RAIC have any right to the property. *United Air Lines, Inc. v. U.S. Bank N.A. (In re UAL Corp.),* 307 B.R. 618 (Bankr.N.D.Ill.2004). This decision, recharacterizing the transaction as secured financing, was ultimately upheld by the Seventh Circuit. 447 F.3d 504 (7th Cir.2006).

Although the RAIC Facilities—345,167 square feet of new or substantially modified terminal space—are within the demised premises of its Terminal Lease, United has the right to exclusive or joint use of only 190,305 square feet of the RAIC Facilities (the "United Areas"). The remaining areas, the "City Areas," are maintained and controlled by the City. This distinction between United Areas and City Areas is created by § 4 of the Terminal Facilities Lease. Under that section, the City has the right to designate areas of United's leasehold to be "public, concession, vertical transportation and building mechanical and custodial areas." (United Ex. 5, § 4.A.) The parties agreed that the City would have exclusive care, custody and control of the City Areas, and that the City would maintain and operate the City Areas reasonably and in accordance with the terms of the Lease.

In September of 2005, prior to the final resolution of the recharacterization issue, United proposed its Plan of Reorganization ("Initial Plan") and Disclosure Statement ("Initial Disclosure Statement"). (Case Docket Nos. 12638, 12640.) The Initial Plan provided:

> If and only to the extent that a Final Order is entered in the LAX Municipal Bond Adversary Proceeding finding that each such Municipal Bond Lease is a "secured financing," such Municipal Bond Lessor shall be entitled to: (a) Class 1B–2 and 2B–2 Other Secured Claims, as applicable, to the extent of the value of collateral subject to the

Municipal Bond Lease under Section 506 of the Bankruptcy Code if such Municipal Bond Lessor qualifies as a secured creditor under applicable non-bankruptcy law; and (b) Class 1E–3 and 2E–3 Other Unsecured Claims, as applicable, for any amounts owed by the Debtors exceeding the value of the collateral or for the entire amount of such Claim if the Municipal Bond Lessor does not qualify as a secured creditor under applicable non-bankruptcy law.

(Article VII.E.3.b(ii).) The Initial Disclosure Statement contained identical language in Article IV.F.5.c(ii).

UMB's predecessor objected to the Initial Disclosure Statement on the ground that it did not provide bondholders "adequate information related to the treatment of 'recharacterized' (if any) claims related to the bonds, thus leaving those holders guessing as to how the Debtors intend to treat their claims under the Plan." (Objection of U.S. Bank. N.A., Case Docket No. 13114.)

Thereafter, United changed the provision in the Plan, (§ VII.E.3(b), Case Docket No. 14813.) The new provision made two changes. First, it eliminates references to applicable non-bankruptcy law and Section 506 of the Bankruptcy Code. Second, instead of referring to "collateral subject to the Municipal Bond Lease," it refers to "United's leasehold in that certain terminal lease at issue in the LAX Municipal Bond Adversary Proceeding." The new provision reads as follows:

> If and only to the extent that a Final Order is entered in the LAX Municipal Bond Adversary Proceeding finding that each such Municipal Bond Lease is a "secured financing," such Municipal Bond Lessor shall be entitled to: (a) Class 1B–2 and 2B–2 Other Secured Claims, as applicable, to the extent of the value of United's leasehold in that certain terminal lease at issue in the LAX Municipal Bond Adversary Proceeding (the "LAX Security Interest"); and (b) Class 1E–3 and 2E–3 Other Unsecured Claims, as applicable, for any amounts owed by the Debtors exceeding the value of the LAX Security Interest.

The Second Plan was confirmed on January 20, 2006, and so its version of § VII.E.3(b) specifies the treatment of UMB's claim.

## Conclusions of Law

*1. The extent of the collateral.* United's Initial Plan and the confirmed Second Plan both define a treatment of UMB's claim based on the value of a particular leasehold. Both plans imply that there are multiple "Municipal Bond Leases" involved in this adversary proceeding and both plans state that the defined claim treatment will be effective only if "each such Municipal Bond Lease" is finally determined to be a "secured financing." Because this court's order recharacterizing the leases involved in the RAIC financing has become final, UMB does have a secured claim, based on the value of the relevant leasehold. However, the parties disagree about the identity and extent of that leasehold, each arguing that it is something other than the 345,167 square feet comprising the RAIC Facilities. None of the arguments are persuasive.

■ *a. The relevant lease: the Facilities Sublease.* The confirmed Second Plan describes the relevant collateral as "United's leasehold in that certain terminal lease at issue in the LAX Municipal Bond Adversary Proceeding." UMB argues that this phrase should be read as referring to the entirety of United's underlying Terminal Lease from LAX, rather than the RAIC Facilities defined by the Partial Assignment and Facilities Sublease. But for several reasons, the Facilities Sublease is the far more reasonable referent.

First, the Terminal Lease was never "at issue" in this adversary; rather, the nature of the Facilities Sublease as a true lease was the subject of dispute. Moreover, United's leasehold under the Facilities Sublease is what this court had found to be collateral under the recharacterization decision that had been issued before United's plan was proposed.

Second, by treating UMB's claim as secured by the Facilities Sublease, United's plan provides the treatment required by the Bankruptcy Code. The effect of the Facilities Sublease was to create a leasehold mortgage securing United's bond payment obligations. Recharacterized as such, the Facilities Sublease provided the collateral that generated a secured claim under § 506(a) of the Bankruptcy Code. Although United could offer to pay more than the value of this collateral under a plan, there is no apparent reason why it would seek to do so.

Third, if there had been a basis for claiming a collateral interest in United's entire Terminal Lease, it would have been appropriate for an objection to be made that the plan did not clearly recognize such an interest. However, as noted above, in the only objection to United's Initial Plan provision, UMB's predecessor never asserted a right to a secured claim based on the value of United's Terminal Lease, and no objection was made to the provision of the Second Plan.

b. *The scope of the Facilities Sublease: the RAIC Facilities.* Even with its collateral limited to the leasehold described by the Facilities Sublease, UMB argues, based on the language of the Sublease itself, that its collateral is United's entire leasehold interest in Terminals 7 and 8. The Sublease, as noted above, dealt with that portion of its Terminal Lease that United transferred to RAIC by way of the Partial Assignment. The Partial Assignment refers to the RAIC Facilities gener-

ally as the "new and expanded terminal facilities," and according to UMB all of Terminals 7 and 8 became new and expanded as a result of the 1982 construction. Because the "new" and "old" facilities are intertwined, UMB argues that a lender would have required the entire leasehold to serve as collateral, and UMB supplied testimony to this effect. (Tr. 4/10, 238:20–242:12.) However, Exhibit A to the Partial Assignment flatly contradicts this argument. This exhibit clearly limits the RAIC Facilities—assigned to RAIC by United and leased back to United under the Facilities Sublease—to specified areas improved with the bond proceeds.

Finally UMB points to the Contingent Lease, which does provide UMB with a right to lease all of Terminals 7 and 8. However, the contingency that generates this right is a default by United under its Terminal Lease with LAX—a default which has not occurred—rather than a default on the Facilities Sublease (which United breached by failing to make bond payments). The Contingent Lease has nothing to do with the collateral securing UMB's claim for bond payments.

■ On the other side of the dispute over the scope of the collateral, United argues that UMB's collateral under the Facilities Sublease is not the 345,167 square feet of RAIC Facilities, but is much less than that amount. Although all of the RAIC Facilities are within the premises rented by United under its Terminal Lease, United has the right to exclusive or joint use of only the "United Areas." United argues that it has no interest in the remaining space because the City controls and maintains that portion of the RAIC Facilities. As a result, United argues that UMB's collateral is limited to the United Areas of the RAIC Facilities.

Although the City Areas are treated differently under the Lease than the United Areas, Section 4 does not excise the City Areas from United's leasehold estate—they remain part of the demised premises. The City is not free to do whatever it pleases with those areas. Instead, the City must, at its expense, maintain and operate those public areas. To the extent that United cannot control a portion of the RAIC Facilities, the value of its leasehold interest in the RAIC Facilities will be lower, but that diminution in value does not excise the City Areas from the collateral.

■ *2. Valuation of the leasehold interest in the RAIC Facilities.* With UMB's collateral defined as a leasehold of 345,167 square feet of RAIC Facilities, as specified by the Facilities Sublease, the next step in valuing the collateral is to determine the proper valuation method. In the absence of any plan provision to the contrary (and there is none in United's plan), the value of collateral retained under the plan must be its replacement value— "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 960, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Determining replacement value for actively-traded, fungible collateral is a relatively straight-forward fact-finding endeavor, complicated only by questions of whether the retail or wholesale market sets the appropriate price, and if retail, whether deductions of the retailer's value-added services are appropriate. *Id.* at 965, n. 6, 117 S.Ct. 1879; *In re Gonzalez,* 295 B.R. 584, 590–91 (Bankr.N.D.Ill.2003) (discussing deductions from retail replacement cost). Determining replacement value is more complex where the property is unique—as is the case with real estate. The most common method of determining the value of real estate is with reference to "comparables," transactions involving similar properties. *See, e.g., In re Abruzzo,* 249 B.R. 78, 85–87 (Bankr.E.D.Penn.2000) (employing comparisons of similar properties to value real estate).

The real estate interest in the present case, however, cannot be valued by a comparison to sales of comparable property. Leasehold interests are rarely sold, and no evidence was introduced as to any sales of comparable leaseholds. Rather, the value of a leasehold is generally measured by determining the future rent payments that the leasehold would likely generate over its term, less any rent that the owner of the leasehold would be required to pay, discounted to present value. In this case the owner of the leasehold would have no obligation to pay future rent, since United is responsible for paying all of the rent due under the Terminal Lease, and its Partial Assignment required no payment of rent by RAIC or its assignees. *Cf. In re UAL Corp.,* 2007 WL 188011 (Bankr.N.D.Ill. Jan. 22, 2007) (discussing a similar financing transaction at San Francisco International Airport). Thus, the value of the leasehold is simply the discounted stream of rental payments that the RAIC Facilities would receive in the market, during the term of the leasehold.

The arguments of United and UMB both start from this premise, but they diverge sharply on the questions both of the rent that the leasehold could generate and on the appropriate discount rate for determining present value.

*(a) Future rent payments.* United bases its assessment of rent that would be generated by the RAIC Facilities on the rates now in place for seven major airlines that rent space in Terminals 2 and 4–8 at LAX under long-term leases requiring periodic renegotiation of the rental rates. In 2005 and 2006 the City negotiated new rental rates with these airlines. (Tr. 4/10/07, 176:9–177:18.) As a result of the negotiations, the parties agreed on a rental

rate of $16 per square foot for terminal space beginning in August 2004, and annual increases thereafter, concluding with a final rate of $21/sq. ft. in August 2008, after which another negotiation would be required. (United Ex. 8; Tr. 4/11, 60:4–12; 71:25–72:15.) The negotiated rate as of January 2006, the time of plan confirmation, was $17/sq.ft.

This rate bears the hallmarks of a useful comparable. The RAIC Facilities are in the same airport and would be used for the same purpose as the terminal space for which the rent was negotiated; indeed, they are simply a subset of that terminal space. The parties to the negotiation, the City and the airlines, were knowledgeable and sophisticated. Additionally, the rate is current and was recently negotiated. This evidence makes it unlikely that the RAIC Facilities' fair market rental rate would vary significantly from the general rate that prevails at LAX.

UMB challenges this conclusion, arguing that the City was constrained from charging market rates to holders of long-term leases. As UMB sees it, the long-term leases interfered with the City's ability to charge market rent in three ways. First, pursuant to the long-term leases, the City only charges the lessees rent for the "usable" space, that is, space within the lessees' exclusive or joint control, rather than for the entire "rentable" space covered by the lease. It does not charge for what are known as "City Areas"—common areas such as restrooms and corridors that the leases place under the City's control. (Tr. 4/10/07,189:16–190:2.) Second, the City is not able to charge rent for improvements to the leaseholds that the lessees constructed. (Tr. 4/11/07, 47:21–23.) Third, in the event the parties could not agree on a rate adjustment, the dispute would go to arbitration, and although any arbitrated rate increase would have retroactive effect, the City could not charge interest on the back payments. (Tr. 4/10/07, 180:5–181:7.)

None of these asserted constraints, however, was shown to have a significant effect on the rates actually negotiated, and it is unlikely that the first two could have had any effect. The first of the asserted constraints—that no rent was charged on "City Areas"—does not affect the ability of the City to obtain a market rate for the entire premises. A simple example can illustrate the principle at play here. Suppose that a building of 10,000 square feet is leased, with 5,000 square feet consisting of common areas under the control of the lessor. If the parties agree that the annual rent for the building should be $200,000, they can express that result either as a charge of $20/sq.ft. for the entire "rentable space" in the building or as a charge of $40/sq.ft. for the "usable space" under the exclusive control of the lessee. Use of "rentable" versus "usable" space methodology has no necessary effect on the overall rent charged. Either approach can reflect a market rate, as long as it is applied consistently.[2]

2. Both parties cite a recent decision by the Department of Transportation resolving a rate dispute between the City and airlines renting space at Terminals 1 and 3 at LAX as bearing on the City's ability to change rent on a "rentable space" basis. *Alaska Airlines, Inc. v. LAWA*, Docket No. OST–2007–27331 (June 15, 2007). After the airlines' leases for Terminals 1 and 3 expired, the City imposed a new rate on all "rentable" space in those terminals, claiming to have used the market rate derived from the recent negotiations with the seven major airlines, described above. However, because those negotiations resulted in a rate for "usable" space, the DOT understandably found the City's approach unreasonable, in that it applied the higher rate based on a portion of the rented premises to the entire rented premises. (Decision at 56.) The DOT's rejection of the City's use of a rentable space method in this situation in no way contradicts the principle that either a usable or rentable rate can reflect the market for particular real estate.

When the City and the major airlines entered into the underlying leases, they were free to specify a particular method for determining the rental rate. In the context of setting this negotiated rate, the parties used the usable space method. Trying to value the leasehold according to a different method—one not currently used to value long-term leaseholds at LAX—adds a needless layer of complexity, and another opportunity for error or misdirection, to this process. The evidence does not provide a sound basis for determining what rate the parties would agree to using the rentable space method, but it does provide a sound basis for determining what rate parties would agree to using the usable space method.

Second, the City's agreement not to charge rent for future improvements constructed by the airlines does not indicate that the rate negotiated for the other terminal space is below-market. In United's case, the Terminal Lease provision dealing with adjustments to the rental rate requires that "the adjusted rental shall additionally specifically exclude evaluation of structures and facilities added by Lessee in connection with the making of Lessee's Improvements." (United Ex. 5, § 6.G.) While this provision certainly reduces United's rental payments, and therefore makes the total payment below-market for of all terminals 7 and 8, it is easy to see why this provision was necessary. Without it, United might have been forced to pay twice for improvements—first to build them, and second to rent them. This provision limits which facilities United pays rent on; it does not indicate that the negotiated rate-per-square-foot for the facilities on which it does pay rent is below-market. In fact, since the surrounding property on which United does pay rent is used for the same purposes as the RAIC property, the charge United would have to pay to rent the RAIC Facilities can best be measured by the rent that it does pay on that surrounding property.

Finally, although the City had an incentive to reach an agreement without pursuing lengthy arbitration, due to its inability to receive interest on back-rent (Tr. 4/10, 180:5–181:7), there is no indication that this incentive changed the outcome of the parties' negotiations. The extent to which this constraint might have depressed the negotiated rate—if at all—would be speculation. Moreover, there is at least some evidence indicating that the negotiated $17–$21/sq.ft. is within a reasonable range of market rents. In 2006, the rate per square foot of terminal space at the Tom Bradley International Terminal at LAX was $24. As acknowledged by the parties in post-trial argument, the airlines that operated out of the International Terminal in 2006 held short-term leases. These leases were necessarily negotiated without the possibility of delays due to arbitration. The fact that these rates are in roughly the same range indicates that the City's allegedly poor bargaining position had a minor effect, if any, on the rental rate.

In sum, the recently negotiated rate for terminal space at LAX supports United's position that the fair market rental value for the RAIC Facilities was $17 per square foot on a usable basis as of the confirmation date, increasing to $21 per square foot by August 2008.

UMB's counterargument is based on the revenue that a different business plan would be expected to generate, and therefore the amount at which an entity other than a major airline would value the leasehold. This business plan is modeled on one used by an entity called LAX Two. LAX Two is a company that operates Terminal 2 at LAX for the benefit of three member airlines. (Tr. 4/10, 38:2–25.) It rents Terminal 2 from LAWA pursuant to a long-term lease and sublets terminal

space to airlines on a fee-for-use basis. (Tr. 4/10, 45:3–12.) It also provides substantial services relating to the operation of a terminal. A number of airlines operate out of Terminal 2 on this basis, and the agreements vary in duration, with some being as short as 30 days and others being as long as 5 years. (Tr. 4/11, 140:2–6.)

Extrapolating results from the LAX 2 operation, UMB's expert calculated the net revenues of an entity operating a LAX Two-type enterprise from all of Terminals 7 and 8 in two steps. First, he applied the rates LAX Two charges for terminal use to the projected level of future activity at Terminals 7 and 8. (UMB Ex. 1, at 23–27, Appendix A.) His model assumed an increase in these rates consistent with the consumer price index for the area, (*Id.* at 23–24.) Second, he deducted from this revenue costs the operator would likely incur. (*Id.* at 24–26.) These included (a) lease payments based on United's current rates, and (b) operating, maintenance and administrative costs based on a blend of (i) LAX Two's costs and (ii) the City's current charges operating and maintenance services in the City Areas. (*Id.*) He assumed that all of these costs would increase annually by an existing contract rate, the consumer price index, or as a percentage of revenues. (*Id.*)

The result, set forth in Exhibit 3–3 to the expert report, is a projection of net revenue that the operator would generate at Terminals 7 and 8. (*Id.* at 26.) Because the RAIC Facilities are only a portion of Terminals 7 and 8, the expert then reduced this net revenue proportionally. This model generated about $63 of net revenue per square foot of terminal space. UMB argues that this rate, which is roughly four times the negotiated rate at LAX, is the actual market rate for terminal space at LAX.

Several flaws make this model unusable. This model does not account for all of the expenses that United currently pays for which the operator of a LAX–Two enterprise would presumably also have to pay. There is no support in the record for UMB's speculation that a private operator would make up this cost different simply by being more efficient than United. As admitted by UMB, this correction raises LAX Fifteen's operating expenses by roughly 50% and reduces the net revenue by roughly 10%. (Reply Brief of UMB, Adversary Docket No. 308, at 29.) Although it is reasonable to expect that repairs and renovations may be necessary over the course of fourteen years, the model does not allow any cost for this expense. UMB's expert's opinion that no repairs will be necessary is not credible. (Tr. 4/10, 161:19–163:2.) Additionally, the model does not include depreciation for the upfront cost of equipment necessary to operate. An operator would be required to make substantial investment to furnish the RAIC Facilities with everything from telephones and computers to desks and chairs. By failing to address these expenses, the model provides an unreliable projection of net revenue. Moreover, there is a problem of scaling; the expert provided no basis for the implied conclusion that the ratio of costs to revenues in operating only a few gates within a terminal would be the same as the ratio in operating an entire terminal.

But even if this model produced a plausible projection of net revenue, it is inappropriate to use the net revenues as a measure of market rent. Net revenues only indicate the maximum amount that an operator would be willing to pay for the property, since this amount would produce no return on whatever investment the operator had to make. There is no evidence of the internal rate of return that the operator of a LAX–Two enterprise would require, and so there is no evidence of the actual amount such an operator would be willing to pay for the property.

Thus, the evidence in the record pertaining to the potential net revenues of a hypothetical LAX Two-type operator provides no basis for valuing United's leasehold interest in the RAIC Facilities.

Both parties agree that lease rates at LAX will likely increase annually in step with inflation. (UMB Ex. 1, at § 3.4.1–2; United Ex. 9, at 14.) Because United's expert offered a more recent ten-year average, that average—2.9%—will be used to estimate annual increases in rental value after the scheduled rate ceases at the end of July 2009.

Finally, the RAIC Facilities include both City Areas and United Areas. Because the market rate used here was determined with reference to a rate that was calculated according to the "usable space" method, the rate must be applied on that same basis. The market rate must be applied to the RAIC Facilities by multiplying the market rate by the total usable area—the 190,305 square feet comprising the United Areas.

(a) Discount rate

█ In order to assign a value to United's leasehold interest in the RAIC Facilities, the expected future payments must be discounted to present value as of January 20, 2006, the date of United's plan confirmation hearing. *See Till v. SCS Credit Corp.* 541 U.S. 465, 466, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) (noting, in a present value determination mandated for Chapter 13 cram down, that "[a] debtor's promise of future payments is worth less than an immediate lump sum payment because the creditor cannot use the money right away, inflation may cause the dollar's value to decline before the debtor pays, and there is a nonpayment risk.") A discount rate

determines what present sum is "equivalent" to a series of future payments. A discount rate generally accounts for the time value of money and the uncertainty of the future payments. *Cf. Price v. Marshall Erdman & Assocs.*, 966 F.2d 320, 327 (7th Cir.1992) ("A computation of damages that ignores the difference in risk between earnings in a volatile occupation and a judicial award of a lump sum equal to the present value of those earnings is unsound."). The proper discount rate will make UMB indifferent to receiving a lump sum payment at the present time or a stream of future payments.

The stream of income here comes from the rental payments generated by the RAIC Facilities. The most likely tenant of these facilities is a major airline. There are several risks involved with this stream of income. The most obvious is the risk of a tenant's nonpayment. Furthermore, while a stronger airline industry would tend to drive up the rental rates, a weaker industry would tend to drive down the rates. These risks pertain to the air transportation industry as a whole. There are also risks specific to LAX. After a tenant's nonpayment, there would likely be some delay before another airline could reconfigure its schedules to use the vacant terminal space. The higher the demand for terminal space at LAX, the shorter this delay would likely be. Thus, future rates depend on local factors as well as industry-wide factors.

UMB's expert offers a discount rate of 8.7% blended from two sources, (1) the taxable equivalent of the current yield to maturity of General Obligation Airport Revenue Bonds ("GARBs") issued by LAX,[3] and (2) an informal survey of cargo warehouse developers regarding their ex-

---

3. The "yield to maturity" is the rate of return an investor would receive if she held the bond until maturity. Under current tax law, income from GARBs is tax-free, whereas the

income stream from the RAIC Facilities is not. Because investors are willing to receive a lower rate of return from a tax-free invest-

pected rate of return from a project at LAX.

This second component—the expected rate of return of warehouse operators—is not helpful to this analysis. The RAIC Facilities are a significantly different asset than a cargo warehouse, the holder of a leasehold interest in the RAIC Facilities would face different risks than the developer of a cargo warehouse, and UMB provided no basis for adjusting a discount rate to reflect the differences. This component is not usable.

GARBs, on the other hand, do provide a baseline for risk at LAX. GARBs are bonds issued by LAX to finance airport improvements. They are supported by the general revenue of the airport—landing fees, facility rents, concessions, etc. (*Id.* at 20.) They reflect the market's assessment of risk associated with demand for facilities at LAX. As adjusted for taxes by UMB's expert, that rate is 8.9%. (UMB Ex. 1 at 21.) Although GARBs do a good job of indicating airport-specific risk, they provide a diversified income stream from many activities at the airport. This reduces their risk. A stream of income from a particular asset carries greater risk. Therefore the taxable equivalent of the current yield to maturity of GARBs is not by itself adequate to establish a discount rate.

United offers as a discount rate the industry-wide cost of capital as reported by Ibbotson Associates, an investment research firm. United's expert relied on the "SIC Composite" subcategory of the "CAPM plus size premium" category to select a discount rate of 14.88%. The SIC Composite subcategory is derived from all companies in this industry. (United Ex. 17 at 5.) The relevant SIC, or industry classification, is 4512, which included seventeen airlines in 2005. (*Id.* at A–30.) This SIC is the most specific classification for the airline industry. (*Id.* at 4, A–30.) Although UMB argues that Ibbotson's "Large Composite" subcategory is more appropriate, that subcategory only includes data from the three largest airlines, measured by sales. (*Id.* at 5.) Here, it is possible that any of the air carriers represented in the SIC would rent the RAIC Facilities, not just one of the largest three. UMB also argues that United's expert selected the wrong time period. The 14.88% cost of capital is from Ibbotson's "2006 Yearbook," and includes data "through March 2006." (United Ex. 16.) This appears to be an analysis of the first quarter of 2006. While January 20—the relevant date—is within the first quarter, an analysis of that quarter is based also on economic activity that took place after the confirmation date. That post-confirmation data is not relevant, and it comprises over two-thirds of the data upon which United's discount rate relies. A better estimate of the cost of capital at the time of confirmation is 14.37%, as reported in the Ibbotson 2005 Yearbook drawing on data through December 2005. (UMB Ex. 55.) (FN: United's Exhibits 15 and 17 are also portions of Ibbotson's 2005 Yearbook, but they appear to be from an earlier edition drawing on data through March 2005. The later edition of the 2005 Yearbook provides a more reliable estimate of the cost of capital at the time of confirmation.) The risk of nonpayment here is similar to the risk that the tenant—an airline—would default on other obligations. The cost of capital reflects this risk, and is a good measure of industry-wide risk.

However, the risk of a failure by any given airline to honor its general obligations is different from the risk associated with the RAIC leasehold involved here. While an airline's default could result in a complete loss of any investment with that

ment, the yield to maturity of GARBs must be adjusted upward.

airline (as would occur if the airlines assets were insufficient to pay its secured debt), the RAIC leasehold could be relet in the event of default by an airline tenant, reducing the risk associated with this stream of income.

In short, neither party's discount rate adequately measures the risks inherent in this stream of income. The discount rate offered by UMB (8.9%) captures the local risk and the discount rate offered by United (14.37%) captures the industry-wide risk in this stream of income. These two rates provide a floor and a ceiling, respectively, with the appropriate discount rate somewhere in between. Lacking evidence that indicates that the appropriate dis-

count rate lies closer to one extreme than the other, the mid-point of 11.64% is the best conclusion possible from the evidence presented.[4]

The following chart sets forth the projected stream of payments the RAIC Facilities would likely generate. The rate begins at $17 per square foot of United Area as of the confirmation date, and increases to $21 per square foot by August 2008. After that, the rate increases by 2.9% annually through November 15, 2021. These payments are then discounted by 11.64% per year to determine their present value in 2006. The resulting sum is the replacement value of United's leasehold interest in the RAIC Facilities.

| Time Period | Rate | Total Rent | Discount Rate | Discounted Value |
|---|---|---|---|---|
| 1/20/2006 to 7/31/2006 | $17.00 | $1,710,659.00 | 1.000000000 | $ 1,710,659 |
| 8/1/2006 to 1/19/2007 | $17.50 | $1,569,365.00 | 1.000000000 | $ 1,569,365 |
| 1/20/2007 to 7/31/2007 | $17.50 | $1,760,972.98 | 0.895736295 | $ 1,577,367 |
| 8/1/2007 to 1/19/2008 | $18.50 | $1,659,042.49 | 0.895736295 | $ 1,486,065 |
| 1/20/2008 to 7/31/2008 | $18.50 | $1,861,600.01 | 0.802343511 | $ 1,493,643 |
| 8/1/2008 to 1/19/2009 | $21.00 | $1,883,237.42 | 0.802343511 | $ 1,511,003 |
| 1/20/2009 to 7/31/2009 | $21.00 | $2,113,168.00 | 0.718688204 | $ 1,518,709 |
| 8/1/2009 to 1/19/2010 | $21.61 | $1,937,851.00 | 0.718688204 | $ 1,392,711 |
| 1/20/2010 to 7/31/2010 | $21.61 | $2,174,449.44 | 0.643755109 | $ 1,399,813 |
| 8/1/2010 to 1/19/2011 | $22.24 | $1,994,049.00 | 0.643755109 | $ 1,283,679 |
| 1/20/2011 to 7/31/2011 | $22.24 | $2,237,508.47 | 0.576634816 | $ 1,290,225 |
| 8/1/2011 to 1/19/2012 | $22.88 | $2,051,876.42 | 0.576634816 | $ 1,183,183 |
| 1/20/2012 to 7/31/2012 | $22.88 | $2,302,396.21 | 0.516512734 | $ 1,189,217 |
| 8/1/2012 to 1/19/20013 | $23.54 | $2,111,380.84 | 0.516512734 | $ 1,090,555 |
| 1/20/2013 to 7/31/2013 | $23.54 | $2,369,165.70 | 0.462659203 | $ 1,096,116 |
| 8/1/2013 to 1/19/2014 | $24.23 | $2,172,610.88 | 0.462659203 | $ 1,005,178 |
| 1/20/2014 to 7/31/2014 | $24.23 | $2,437,871.51 | 0.414420640 | $ 1,010,304 |
| 8/1/2014 to 1/19/2015 | $24.93 | $2,235,616.59 | 0.414420640 | $ 926,486 |
| 1/20/2015 to 7/31/2015 | $24.93 | $2,508,569.78 | 0.371211609 | $ 931,210 |
| 8/1/2015 to 1/19/2016 | $25.65 | $2,300,449.48 | 0.371211609 | $ 853,954 |
| 1/20/2016 to 7/31/2016 | $25.65 | $2,581,318.31 | 0.332507711 | $ 858,308 |
| 8/1/2016 to 1/19/2017 | $26.40 | $2,367,162.51 | 0.332507711 | $ 787,100 |
| 1/20/2017 to 7/31/2017 | $26.40 | $2,656,176.54 | 0.297839226 | $ 791,114 |
| 8/1/2017 to 1/19/2018 | $27.16 | $2,435,810.22 | 0.297839226 | $ 725,480 |
| 1/20/2018 to 7/31/2018 | $27.16 | $2,733,205.66 | 0.266785405 | $ 729,179 |
| 8/1/2018 to 1/19/2019 | $27.95 | $2,506,448.72 | 0.266785405 | $ 668,684 |
| 1/20/2019 to 7/31/2019 | $27.95 | $2,812,468.62 | 0.238969370 | $ 672,094 |
| 8/1/2019 to 1/19/2020 | $28.76 | $2,579,135.73 | 0.238969370 | $ 616,334 |
| 1/20/2020 to 7/31/2020 | $28.76 | $2,894,030.21 | 0.214053538 | $ 619,477 |
| 8/1/2020 to 1/19/2021 | $29.59 | $2,653,930.67 | 0.214053538 | $ 568,083 |

4. Support for this midpoint in discount rates can be gleaned from evidence that the tax adjusted rate required to market bonds supported by a similar arrangement at a major New York airport terminal in 2005 is 13.18%. (United Ex. 48; Tr. 4/10/07, 152:9–153:23.)

| 1/20/2021 to 7/31/2021 | $29.59 | $2,977,957.09 | 0.191735523 | $ 570,980 |
| 8/1/2021 to 11/15/2021 | $30.45 | $1,714,747.81 | 0.191735523 | $ 328,778 |
| | | | | $33,455,055 |

## Conclusion

Based on the foregoing analysis, UMB has a secured claim for $33,455,055 based on the value of the leasehold involved in this adversary proceeding.